



# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV–15–323

| | |
|---|---|
| THRESA KAY SHAMBURGER<br>APPELLANT | **Opinion Delivered** January 27, 2016 |
| V. | |
| ROBERT SHAMBURGER; SARAH JANE SHAMBURGER; JAMES D. SHAMBURGER, JR.; RICKY ALAN JOHNSON; KARYN ANN JOHNSON; S.E. MANAGEMENT, LLP; BRYANT HOSPITALITY; LLP WINNERS CIRCLE HOSPITALITY, LLC; CMH MANAGEMENT, LLP; AND SJS MANAGEMENT, LLP | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT<br>[NO. 23CV-13-981]<br><br>HONORABLE HARRY G. FOSTER, JUDGE |
| APPELLEES | REVERSED AND REMANDED |

## CLIFF HOOFMAN, Judge

Appellant Thresa Kay Shamburger appeals from the circuit court's order granting summary judgment and dismissing her complaint against appellees Robert Shamburger; Sarah Jane Shamburger; James Shamburger, Jr.; Ricky Alan Johnson; Karyn Ann Johnson; S.E. Management, LLP; Bryant Hospitality, LLP; Winners Circle Hospitality, LLC; CMH Management, LLP; and SJS Management, LLP, in appellant's suit for breach of the partnership and buy-sell agreements associated with five limited liability partnerships (LLPs). The circuit court's order also granted relief to appellees Sarah Jane and Robert Shamburger on their counterclaim requesting specific performance of their offer to purchase appellant's interest in the various LLPs for $200,000. In addition, the circuit court awarded $10,500 in attorney's

fees to appellees. Appellant argues on appeal that the circuit court erred by granting summary judgment to appellees because the specific death-or-divorce provision in the parties' buy-sell agreements was mandatory and applied to this case rather than the general buy-sell provision utilized by appellees. Appellant further argues that, in the event we reverse the circuit court's grant of summary judgment, the award of attorney's fees should also be reversed because appellees would no longer be the prevailing party. We agree with appellant's arguments and reverse and remand.

There are five LLPs at issue in this case: (1) CMH Management, LLP; (2) S.E. Management, LLP; (3) Bryant Hospitality, LLP; (4) Winners Circle Hospitality, LLP; and (5) SJS Management, LLP. At the time these LLPs were created, they were each composed of six partners, or three married couples: Sarah Jane and Robert Shamburger, Karyn Ann and Ricky Alan Johnson, and Thresa Kay and James Shamburger, Jr. Each partner had a 16.667% interest in each of the five LLPs.

The partners executed partnership agreements in connection with each LLP, as well as separate buy-sell agreements setting forth the required procedure through which partners could transfer their interests. The buy-sell agreements for S.E. Management, LLP; SJS Management, LLP; Winners Circle Hospitality, LLP; and Bryant Hospitality, LLP, each contained similar language regarding the transfer of a partner's interest.[1] As an example, the

---

[1] S.E. Management, LLP's buy-sell agreement differs only in that there is no five-year prohibition on the voluntary sale or withdrawal by a partner as is found in paragraph 1 of the other agreements. Paragraph 1 of SJS Management, LLP's agreement also includes an exception to the five-year limitation in the event of the death or divorce of a partner, which the other agreements do not contain. In addition, the buy-sell agreements for each LLP set

relevant provisions of the buy-sell agreement for Bryant Hospitality, LLP, are set forth below:

1.      There shall be no voluntary sale or withdrawal by a partner for a period of five (5) years from the date of formation of the company without the unanimous consent of all partners. Thereafter, the parties agree that the only manner in which any of the partners may transfer a partnership interest or cause a partial dissolution of the company shall be in the manner set forth herein:

    (a) Any couple may give notice to both individuals of the other couples, or to any single partner, of an intent to either buy the others' entire company interests or to sell their entire company interest. Such notice shall contain one price at which such transaction shall occur. The offeree couples, or any single partner, shall, for sixty (60) days, have the option to either buy the offerors' entire interests for such price, or to sell their entire interest for such price. Acceptance of either option shall be made in writing and tendered to both individuals of the offering couples within the 60-day time period.
. . . .
    (c) If neither option is timely accepted by both individuals of the offeree couples, the offer shall be deemed an offer to purchase only, and acceptance of such offer shall be presumed.

. . . .

3.      In the event of the death or divorce of a partner, the purchase price of such partner's interest, and the spouse's interest, or the interest of both in the event of common disaster, shall be the higher of the figures achieved in paragraphs (a) and (b) below:

    (a) The aggregate room revenue, reduced by deferred maintenance, for the preceding thirty-six months (or so long as the partnership has been in business, if less than that time), as reflected on the books of the partnership, multiplied by the partner's percentage ownership.

    (b) The applicable percentage of partnership interest of the value of the real property, with all improvements and appurtenances located thereupon, as determined by the average of two appraisals performed by properly qualified and licensed professional appraisers working the central Arkansas area. If the difference in value between the two appraisals is greater than 10%, then the two appraisers shall select a third appraiser, similarly qualified to perform an

---

forth different formulas for calculating the purchase price upon the death or divorce of a partner. None of these distinctions are material to the issues raised in this appeal.

appraisal, and the value shall be determined by the average of the three appraisals.

CMH Management, LLP's buy-sell agreement is very similar to the one set out above, although it contains additional language in subsection (b) of Paragraph 1, which states that "[t]he terms of the sale shall be as described hereinafter in Paragraph 2." Paragraph 2 contains the provision discussing a transfer in the event of the death or divorce of a partner and is not different in any other material respect from Paragraph 3 in the other buy-sell agreements.

Appellant and her husband, James, divorced in January 2010. On October 15, 2013, Sarah Jane and Robert Shamburger mailed a letter to appellant and James, stating that their divorce proceeding had "adversely affected the operation of all the family partnerships" and that, "[i]n an effort to avoid continued disagreements and acrimony harmful to the businesses we propose to purchase your collective interest in all the partnerships, for a total price of $400,000, or $200,000 to each of you." The letter further referred appellant and James to the buy-sell agreements associated with each partnership and stated that they had sixty days from their receipt of the letter to make their election.

Appellant received the letter on October 20, 2013, but did not respond. Instead, she filed a complaint against appellees on December 17, 2013, alleging that her divorce from James had triggered the terms of the buy-sell agreements dealing with a divorced party's interest and that appellees were attempting to bypass that provision by attempting to invoke the transfer provision set forth in Paragraph 1 of the agreements. In order to determine the value of her interests, appellant had also requested an accounting of the income and expenses for each of the LLPs, and she alleged that appellees had failed and refused to provide her with

this information. Appellant requested an order from the circuit court directing that a detailed accounting be provided for each LLP, determining that the attempted buy-sell arrangement by Sarah Jane and Robert Shamburger was in violation of the buy-sell agreements, and ordering a dissolution of the LLPs.

In their answer, appellees denied appellant's allegations and claimed that the divorce provision relied on by appellant applied only to the purchase by one spouse-partner of another spouse-partner's interest following their divorce and that it did not apply to the situation in this case. Instead, appellees asserted that they were exercising the alternative provision set forth in Paragraph 1 of the buy-sell agreements. Appellees also claimed that they had provided all of the financial documentation requested by appellant on October 11, 2013.

Separate appellees Sarah Jane and Robert Shamburger filed a counterclaim against appellant, alleging that appellant had failed to respond to their purchase offer within the sixty-day period required by the buy-sell agreements and that the offer should therefore be deemed an offer to purchase her interest for $200,000. Robert and Sarah Jane requested that the circuit court order specific performance of the terms of the buy-sell agreements and order appellant to execute all necessary documentation required for the sale.

Appellees filed a joint motion for summary judgment on May 23, 2014, asserting that there were no material issues of fact in dispute and that the plain language of the buy-sell agreements provided for two independent and alternative methods for partners to acquire the interest of another couple. Appellees claimed that appellant was seeking to avoid the enforcement of the purchase offer by relying on a different and "considerably more expensive

provision" dealing with divorced partners, a provision that appellees argued was intended to apply only to a purchase between divorced partners.

A hearing was held on appellees' summary-judgment motion on August 4, 2014. After hearing arguments of counsel, the circuit court took the matter under advisement and entered an order on September 30, 2014, granting both appellees' motion and the request for specific performance contained in Sarah Jane and Robert Shamburger's counterclaim. The court did not rule on the other claims that were raised in appellant's complaint. Appellant filed a motion for findings of fact and conclusions of law, which was deemed denied after thirty days. Appellees filed a motion for attorney's fees on October 1, 2014.

After another hearing, the circuit court entered an amended final order on January 15, 2015. The court granted appellees' motion for summary judgment, finding that there were no material facts in dispute; that there was no ambiguous language in the agreements; that there were no inconsistencies between general and specific clauses of the agreements; and that Paragraphs 1 and 3 could be read in conjunction so that enforcement of one would not neutralize enforcement of the other. In addition, the court granted the relief for specific performance requested in the counterclaim and directed appellant to execute the necessary sales documentation to convey her interest in the LLPs to Sarah Jane and Robert Shamburger. The court dismissed appellant's complaint in its entirety, including all claims and requests for relief brought therein. The order also awarded attorney's fees of $10,500 to appellees. Appellant timely appealed from this amended order on January 16, 2015.

Summary judgment is to be granted by the trial court only when there are no genuine

SLIP OPINION

issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Chamberlin v. State Farm Mut. Ins. Co.*, 343 Ark. 392, 36 S.W.3d 281 (2001). In reviewing a grant of summary judgment, an appellate court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Id.* We view the evidence in the light most favorable to the party against whom the motion for summary judgment was filed and resolve all doubts and inferences against the moving party. *Id.*

Appellant does not argue on appeal that summary judgment was inappropriate because genuine issues of material fact remain, nor does she contend that the language used in the buy-sell agreements was ambiguous. Instead, appellant argues that the circuit court erred in interpreting the agreements to find that Sarah Jane and Robert Shamburger were allowed to elect which valuation method to use when attempting to purchase her interest in the LLPs.

As this court stated in *Tri-Eagle Enterprises v. Regions Bank*, 2010 Ark. App. 64, 5–6, 373 S.W.3d 399, 403–04:

> When a contract is free of ambiguity, its construction and legal effect are questions of law for the court to determine. When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed.

(Internal citations omitted). On appeal from a trial court's determination of a purely legal issue, we must decide only if its interpretation of the law was correct, as we give no deference to the trial court's conclusion on a question of law. *Lamb v. Rodriguez*, 2015 Ark. App. 248; *Millwood-RAB Mktg., Inc. v. Blackburn*, 95 Ark. App. 253, 236 S.W.3d 551 (2006).

In support of her argument that the death-or-divorce provision in the buy-sell

7

agreements applied under the circumstances of this case rather than the provision utilized by appellees, appellant cites to two different rules of contract construction. First, appellant discusses the rule of construction stating that "where two provisions of a contract conflict, the specific provision controls over a more general provision, as it is assumed that the specific provision expresses the parties' intent." *Millwood-RAB Mktg.*, 95 Ark. App. at 260, 236 S.W.3d at 556–57. Appellant contends that, pursuant to this rule of construction, the specific death–or–divorce provision controlled over the more general provision in Paragraph 1 of the agreements.

We applied this rule of construction in *Millwood-RAB Mktg.* in the context of country club memberships. In that case, members of the country club had signed a membership agreement entitling the members and their guests to free green fees. *Id.* at 256, 236 S.W.3d at 554. The membership agreement also stated that the members were subject to the rules and regulations contained in the country club's handbook, which could be amended at any time. *Id.* at 257, 236 S.W.3d at 554. The handbook was later amended to require guests to pay green fees, and some of the members filed suit for breach of contract. *Id.* at 258, 236 S.W.3d at 555. We affirmed the trial court and held that, under our applicable rules of contract construction, the more specific provision regarding free green fees controlled over the more general provision authorizing the country club to amend the handbook. *Id.* at 260, 236 S.W.3d at 557.

This rule was also applied in *American Investors Life Ins. Co. v. Butler*, 76 Ark. App. 355, 65 S.W.3d 472 (2002), where we held that a provision in a health–insurance policy regarding a specific cancer treatment applied instead of a more general policy exclusion for experimental

SLIP OPINION

treatments. We noted that this interpretation gave effect to both clauses in the contract, as the medical procedure at issue, while it could be experimental, was a covered expense if certain conditions contained in the specific clause were met. *Id.* at 362, 65 S.W.3d at 476.

Similarly, in this case, we agree with appellant that the specific provision governing transfers in the event of a divorce or death of a partner controls over the more general provision found in Paragraph 1. Appellees argue that Sarah Jane and Robert Shamburger's offer to purchase appellant's and her ex-husband's interest was not necessarily due to the divorce. However, this argument is belied by Sarah Jane and Robert Shamburger's statements in their offer letter that "[t]he divorce proceeding between you has adversely affected the operation" of the LLPs and that the offer to purchase was being made in order "to avoid continued disagreements and acrimony." Appellees also contend that the death-or-divorce provision is not more specific than the provision in Paragraph 1, and they compare the length and detail of the two provisions at issue. As appellant responds, however, it is the fact that the death-or-divorce provision applies only under specific and limited circumstances that renders it controlling over the more general provision in Paragraph 1, not the specificity of the language used to describe each method of purchase.

Appellees further argue that the death-or-divorce provision does not apply in this case because it was intended to apply only when a partner dies or between two divorcing partners. Appellees' suggested interpretation is not persuasive. There is nothing in the language of any of the death-or-divorce provisions that limits its application to those particular situations. In fact, this interpretation directly conflicts with the language in the CMH Management buy-sell agreement, which specifically states that in the event of death or divorce, "the remaining

couple partners" have the right to purchase the interest of the affected couple. In addition, this interpretation does not make sense in light of the language used in the other agreements that refers to the purchase of both the deceased or divorced partner's interest, "*and the spouse's interest*[.]" (Emphasis added.)

In addition to the rule of construction discussed above, appellant contends that the use of the word "shall" in each buy-sell agreement's death–or–divorce provision further supports her claim that application of this provision was mandatory under the circumstances in this case. As appellant argues, "shall" is defined as "[h]as a duty to" or "is required to." *Black's Law Dictionary* (10th ed. 2014). Our supreme court has further held that "shall," when used in a contract provision, means that compliance with that provision is mandatory. *Marcum v. Wengert*, 344 Ark. 153, 40 S.W.3d 230 (2001).

Although appellees argue that there is no conflict between the two different purchase provisions in the buy-sell agreements and that the provisions merely offer independent and alternative options for purchasing another partner's interest, the combination of the specific nature of the death–or–divorce provision and its use of mandatory language such as "shall," indicates that compliance with this particular provision was required under the circumstances in this case. Appellees also contend that interpreting the death–or–divorce provision as mandatory supersedes the procedure set forth in Paragraph 1 of the agreements and "neutralizes" that provision in violation of our rule of construction that we will not adopt an interpretation neutralizing a provision if the various clauses of a contract can be reconciled. *See, e.g.*, *RAD-Razorback Ltd. P'ship v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986). We disagree because interpreting the application of the death–or–divorce provision

as mandatory in this case does not mean that the procedure set forth in Paragraph 1 of the agreements does not apply in all other situations that do not involve the death or divorce of a partner. Furthermore, as appellant argues, it is also possible to reconcile the two provisions in such a way that the general procedures set forth in Paragraph 1 apply, even in the event of a divorce or death of a partner, but the value of the partner's or couple's interest is determined pursuant to the formula set forth in the death-or-divorce provision.

Based on our rules of construction, we agree with appellant that the circuit court erred in interpreting the buy-sell agreements in such a manner as to find that the death-or-divorce provisions did not apply to the offer to purchase appellant's interest in the LLPs. Accordingly, we reverse the circuit court's order granting summary judgment and remand for further proceedings. As appellant argues, by reversing the award of summary judgment to appellees, the award of attorney's- fees must also be reversed, as appellees are no longer the prevailing party.

Reversed and remanded.

GRUBER and WHITEAKER, JJ., agree.

*Taylor & Taylor Law Firm, P.A.*, by: *Tasha C. Taylor* and *Andrew M. Taylor*, for appellant.

*Adkisson & Wilcox, LLP*, by: *William C. Adkisson*, for appellees.